**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**Southeastern Division at Cape Girardeau**

| | |
|---|---|
| **TYLER M. BANKS**, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| | ) |
| v. | )  Case No.: _____ |
| | ) |
| **JOSEPH WHISTLER**, | ) |
| in his individual capacity, | )  *Jury Trial Demanded Under* |
| | )  *Fed. R. Civ. P. 38(b)* |
| and | ) |
| | ) |
| **BRYAN BLANNER**, | ) |
| in his individual capacity, | ) |
| | ) |
| and | ) |
| | ) |
| **ZANE HULVEY**, | ) |
| in his individual capacity, | ) |
| | ) |
| and | ) |
| | ) |
| **CITY OF CAPE GIRARDEAU**, | ) |
| | ) |
| *Defendants*. | ) |

**COMPLAINT**

COMES NOW Plaintiff Tyler M. Banks, by and through his attorneys, Derrick R. Williams, Attorneys & Counselors at Law, LLC, and states and alleges as follows:

**I.    Introduction**

1.    On July 20, 2024, at approximately 9:00 a.m., an uneventful summer morning turned into a terrifying nightmare for Tyler M. Banks when Cape Girardeau Police Department officers unnecessarily escalated a routine traffic stop to officers

repeatedly tasing and striking Mr. Banks, who was unarmed, non-threatening to officers or others, and compliant with the officers' commands. The encounter caused Plaintiff excruciating pain, permanent injuries necessitating hospitalization and profound terror. Mr. Banks feared the officers were going to kill him.

2.      Accordingly, Mr. Banks brings this civil rights action to shed light on Defendants' egregious, unconstitutional misconduct; to hold the Defendants accountable; and to seek justice for the injuries he suffered at the hands of the Defendant Officers.

3.      Mr. Banks, therefore, seeks money damages against (1) Cape Girardeau Police Officers Joseph Whistler (hereinafter "Defendant Whistler"), Bryan Blanner (hereinafter "Defendant Blanner") and Zane Hulvey (hereinafter "Defendant Hulvey") in their individual capacities (collectively, the "Defendant Officers") pursuant to 42 U.S.C. §§ 1983 and 1988 to redress their deprivation of Mr. Banks' clearly established constitutional right to be free from unreasonable seizures, including excessive force, as guaranteed by the Fourth Amendment to the United States Constitution; and (2) the City of Cape Girardeau (hereinafter "Cape Girardeau" or the "City") for an unconstitutional unofficial custom that was the moving force behind Defendant Officers Fourth Amendment violation of Mr. Banks injuries. (See, *Monell v. Department of Social Services*, 463 U.S. 658 (1978)), and its progeny.

## II.    Jurisdiction and Venue

4.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983, 1988.

5.     Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Missouri, Southeastern Division; specifically, Cape Girardeau, Missouri. Moreover, upon information and belief, all parties reside in this judicial district.

### III.     The Parties

6.     At all times relevant hereto, Plaintiff Tyler M. Banks (hereinafter "Mr. Banks") was a citizen of the United States and the city and county of Cape Girardeau, state of Missouri.

7.     At all times relevant hereto, the City of Cape Girardeau was a political subdivision of the state of Missouri, organized and existing under and by virtue of the laws of Missouri.

8.     At all times relevant hereto, Defendant Whistler was a citizen of the state of Missouri, county of Cape Girardeau.

9.     At all times relevant hereto, Defendant Whistler was employed by the Cape Girardeau Police Department (hereinafter "CGPD") as a duly commissioned and sworn police officer and was acting under color of state law, and within the scope of his employment.

10.     At all times relevant hereto, Defendant Blanner was a citizen of the state of Missouri, county of Cape Girardeau.

11.     At all times relevant hereto, Defendant Blanner was employed by the CGPD as a duly commissioned and sworn police officer and was acting under color of state law, and within the scope of his employment.

12.     At all times relevant hereto, Defendant Hulvey was a citizen of the state of Missouri, the county of Cape Girardeau.

13.     At all times relevant hereto, Defendant Hulvey was employed by the CGPD as a duly commissioned and sworn police officer and was acting under color of state law, and within the scope of his employment.

### IV.     Factual Allegations

**A.     Defendant Officers violated Mr. Banks Fourth Amendment right to be free from unreasonable seizures (excessive force), and that right was clearly established at the time of this routine traffic stop.**

14.     Early Saturday morning, July 20, 2024, at approximately 9:04 a.m., Mr. Banks was travelling the posted speed limit southbound on South Kingshighway Street in Cape Girardeau, Missouri.

15.     Defendant Whistler was on patrol traveling directly behind Mr. Banks; both were in the right lane.

16.     Mr. Banks merged into the left driving lane to execute an upcoming left turn at Southern Expressway.

17.     When Mr. Banks merged into the left lane, Defendant Whistler quickly merged directly behind him.

18.     Defendant Whistler alleged Mr. Banks swerved and crossed the broken line that divides the right and left lanes of southbound South Kingshighway Street.

19.     With Defendant Whistler immediately behind him, Mr. Banks reached the intersection of South Kingshighway and Southern Expressway and stopped for the solid red traffic signal.

20.     The light turned green, and Mr. Banks proceeded eastbound on Southern Expressway with Defendant Whistler following directly behind him.

21.     Defendant Whistler activated his emergency lights. Then, he activated his audible siren.

22.     Defendant Whistler contacted his dispatcher and advised that Mr. Banks had failed to yield for him. Mr. Banks continued to travel the posted speed limit.

23.     Defendant Whistler continued to follow Mr. Banks for approximately one mile and within the posted speed limit.

24.     At 9:07:26 a.m., Mr. Banks stopped his vehicle at the posted stop sign at the intersection of Sprigg and Hickory Streets in Cape Girardeau.

25.     At 9:07:36 a.m., while Mr. Banks remained seated in his vehicle, Defendant Whistler leaped from his patrol car, leaving his driver's door wide open, standing between the door and the patrol vehicle with his department issued Taser X26 directed at Mr. Banks' driver's door.

26.     At 9:07:36 a.m., Defendant Whistler laid his Taser on the driver's seat of his patrol car and immediately unholstered his department issued 9mm Glock firearm. He pointed it directly at Mr. Banks' driver's door where Mr. Banks sat inside his car.

27.     At 9:07:41 a.m., Mr. Banks slowly begins to exit his car with his hands extended above his head and into the air.

28.     At 9:07:48 a.m., Mr. Banks was halfway out of his car with his hands extended above his head and in the air when Defendant Whistler shouted: "show me your hands and do not get out of the car."

5

29.     At 9:07:51 a.m., Defendant Whistler shouts: "turn around and face away from me."

30.     At 9:07:52-54 a.m., Mr. Banks complied with Defendant Whistler and turned around, with his back facing Defendant Whistler and his hands remaining extended in the air.

31.     Mr. Banks was compliant, non-threatening and unarmed.

32.     Mr. Banks did not physically or verbally threaten the officers, nor did he attempt to flee. He remained facing away from Defendant Whistler, next to his car's driver's side door and with his hands fully extended into the air.

33.     None of the Defendant Officers had knowledge of any information to reasonably believe that Mr. Banks was armed, violent, or potentially dangerous to anyone.

34.     At approximately 9:07:54 a.m., Defendant Whistler yelled "just stand there, if you do anything else you are going to get dog bit."

35.     At approximately 9:07:58 a.m., Mr. Banks starts to close his driver's door with his left hand, while his right hand remains raised in the air.

36.     At approximately 9:07:59 a.m., Defendant Whistler yelled "don't shut the fucking door."

37.     At approximately 9:08:01 a.m., Defendant Whistler grabbed his Taser X26 in his right hand and his Glock 17 firearm in his left hand and aimed both directly at Mr. Banks.

38.     At approximately 9:08:01 a.m., Mr. Banks momentarily faced his vehicle after shutting the car door.

39.     At approximately 9:08:04 a.m., Defendant Whistler tells Mr. Banks to "face away from me. Now!"

40.     Between 9:08:04-07 a.m., Mr. Banks begins to turn away from Defendant Whistler while keeping his hands raised in the air.

41.     At approximately 9:08:07 a.m., Defendant Whistler yells "stop moving" when he just told Mr. Banks to turn away from him. Mr. Banks complied.

42.     At approximately 9:08:09-14 a.m., although Mr. Banks was not moving and his back was facing Defendant Whistler, without warning, provocation or justification, Defendant Whistler shot Mr. Banks in his back with his department-issued Taser X26, causing a five-second cycle of 50,000 volts of electrical current to race through Mr. Banks' body.

43.     Defendant Whistler tased Mr. Banks while his arms and hands were extended in the air, facing away from Defendant Whistler.

44.     At approximately 9:08:15 a.m., Defendant Whistler shouted to Mr. Banks: "turn around and face away from me or you will get hit with it again."

45.     At approximately 9:08:19 a.m., Defendant Whistler yelled: "don't fucking move."

46.     At approximately 9:08:20 a.m. - 9:09:34 a.m., Mr. Banks continued to stand facing away from Defendant Whistler, his hands raised in the air and facing with his back to Defendant Whistler.

47.    At approximately 9:08:35 a.m., Defendant Blanner arrived on scene, and without speaking to any officer present, jumped from his patrol vehicle, and pointed his department-issued Taser X26 at Mr. Banks. He was approximately fifteen feet away from Mr. Banks.

48.    Two seconds later, at approximately 9:08:37 a.m., Defendant Blanner yelled to Mr. Banks: "on the ground" with his taser pointed at Mr. Banks as he quickly closed the distance between himself and Mr. Banks. Mr. Banks stood next to his car with his hands extended in the air, motionless.

49.    While closing the distance between himself and Mr. Banks, Defendant Blanner shot Mr. Banks in his torso with his department-issued Taser X26, causing a five-second cycle of 50,000 volts of electrical current to race through Mr. Banks' body.

50.    Simultaneously, at 9:08:37 a.m., Defendant Whistler inflicted a third and final Taser X26 shot at Mr. Banks' body.

51.    All three Taser X26 deployments hit the intended target; Mr. Banks' body, causing him to at once fall backwards from his upright, standing position to the concrete pavement, violently striking his head, neck, and back.

52.    At approximately 9:08:41 a.m., within that four-second timeframe, Defendants Blanner and Whistler caused three separate blasts of 50,000 volts of electrical current to pass through Mr. Banks body.

53.    From 9:08:41 to 9:12:42 a.m., as a result of striking his head, neck and back upon the concrete pavement, Mr. Banks lost consciousness.

54.    Between approximately 9:08:41 a.m. and 9:10:59 a.m., while Mr. Banks was unconscious, Blanner forcibly kneeled on Mr. Banks' back and while Defendant Hulvey kneeled on his neck causing fractures to Mr. Banks' ribs and a concussion to his head.

55.    At approximately 9:11:59, after Mr. Banks was handcuffed, Defendant Blanner decided to activate his body worn camera.

56.    Defendant Officers did not seek medical attention for Mr. Banks. Rather, they transported him directly to jail. Ultimately, the state prosecutor charged Mr. Banks with the B misdemeanor of driving while intoxicated and the A misdemeanor of resisting a lawful stop/yield.

**B.    The City of Cape Girardeau's unconstitutional, unofficial custom of excessive force was the moving force behind the violation of Mr. Banks' Fourth Amendment right.**

*(1)    The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees*

57.    According to media sources, the City entered into a monetary settlement with Robert Teater for a 2021 incident wherein Cape Girardeau Police Department officers violated the Fourth Amendment and used excessive force against Mr. Teater by beating him, tasing him, and pressing a knee on Mr. Teater's back such that his ribs fractured. Mr. Teater was hospitalized with multiple visible physical injuries as a result of the police beating. The City took no disciplinary action against the officers for the use of excessive force against Mr. Teater. https://kzimksim.com/2024/09/03/the-city-of-cape-girardeau-has-agreed-to-pay-two-lawsuits/.

58.     According to media sources, the City entered into a monetary settlement with Ryan Mosley for a 2022 incident wherein Cape Girardeau Police Department officers violated the Fourth Amendment and used excessive force against Mr. Mosley by beating him, tasing him, pressing a knee on Mr. Mosley's back, and kicking him in the head rendering him unconscious. Mr. Teater was hospitalized with multiple visible physical injuries as a result of the police beating. The City took no disciplinary action against the officers for the use of excessive force against Mr. Mosley.

 https://kzimksim.com/2024/09/03/the-city-of-cape-girardeau-has-agreed-to-pay-two-lawsuits/.

59.     The City had notice of a 2020 incident wherein Cape Girardeau Police Department officers used excessive force against Lloyd Gilmore for which Mr. Gilmore filed suit against the officers alleging that while he was being arrested, handcuffed and shackled, officers beat him, tased him, and punched him. (Compl.) *Gilmore v. Leadbetter, et al.*, Civil Action No.: 1:25-cv-00066-SNLJ (Eastern District Mo. 2025)

https://kzimksim.com/2024/09/03/the-city-of-cape-girardeau-has-agreed-to-pay-two-lawsuits/.

60.     According to media sources, the state Highway Patrol and Cape Girardeau Police Department are investigating a 2025 vehicle pursuit that led to the death of a man who crashed his dirt bike motorcycle into a tractor-trailer. One of the officers involved in the pursuit is Cape Girardeau Police Department officer, and Defendant here, Joseph Whistler, who has a history of excessive force allegations against him. He was involved

in multiple altercations that resulted in sending subjects to the hospital with injuries and two lawsuit settlements paid by the city.

https://www.semissourian.com/news/controversial-officer-involved-in-fatal-police-chase-under-mshp-investigation-ecfad8e7

*(2)    Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct*

61.    The City Manager and Council receive notice of each lawsuit filed against the City.

62.    All monetary settlements made by the City must be approved by the City Manager and Council.

63.    The Cape Girardeau Police Department's Policy Manual requires that the Chief of Police report to the City Manager each instance of officer misconduct and in accordance with the same, the Chief of Police reported to the City Manager each instance of officer misconduct.

64.    While the settlements of Teater and Mosley were locally billed as transformational, they had no meaningful impact on how the Cape Girardeau Police Department conducts its business.

*(3)    An injury by acts pursuant to the government entity's custom*

65.    Mr. Banks each suffered debilitating physical pain and suffering as a result of striking his head, neck, and back against the concrete pavement after Defendant Officers deployed their Taser X26 a total of three times in rapid succession at 50,000 volts of electricity each deployment.

66.     Mr. Banks incurred medical expenses, past and future.

**COUNT I — 42 U.S.C. §1983 — Fourth Amendment Violations**
*Plaintiff v. Whistler, Blanner, and Hulvey, Individually Capacities*

67.     Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

68.     The conduct of the officers identified in this count and described herein constituted excessive force in violation of the Fourth Amendment of the United States Constitution, and clearly established law.

69.     At all material times, Defendants Whistler, Blanner, and Hulvey were each acting under color of state law, as agents of Cape Girardeau, and within the scope of their employment and authority as commissioned law enforcement officers of the City of Cape Girardeau.

70.     At all material times, Defendants Whistler, Blanner, and Hulvey had no reason to believe that Mr. Banks was armed and dangerous.

71.     At all material times, Defendant Whistler did not have a reasonable fear of imminent bodily harm when he shot Mr. Banks in the back with his department-issued Taser X26, causing 50,000 volts electrical current to course through Mr. Banks' body, nor did Defendant Whistler have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Banks.

72.     At all material times, Defendant Blanner did not have a reasonable fear of imminent bodily harm when he shot Mr. Banks in the back with his department-issued Taser X26, causing 50,000 volts electrical current to course through Mr. Banks' body, nor

12

did Defendant Blanner have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Banks.

73.    At all material times, Blanner and Hulvey did not have a reasonable fear of imminent bodily harm when they kneeled on Mr. Banks' back, nor did they have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Banks.

74.    Every reasonable officer would have known that using force against a compliant individual who is not resisting arrest constitutes excessive force in violation of the Fourth Amendment.

75.    Defendants Whistler, Blanner, and Hulvey use of excessive force in tasing and kneeling on Mr. Banks back was objectively unreasonable and violated clearly established law.

76.    Defendants Blanner and Hulvey's use of force in applying direct pressure to and kneeling on Mr. Banks' back was objectively unreasonable and violated clearly established law.

77.    It was objectively unreasonable for Defendant Officers to taze and kneel on Mr. Banks' back without providing medical attention when Mr. Banks lost consciousness.

78.    It was a violation of Mr. Banks' Fourth and Fourteenth Amendment rights for Defendant Officers not to render medical aid following Mr. Banks' loss of consciousness, which demonstrated a serious medical need.

79.    As a result of Defendant Officers' unjustified, excessive, and illegal use of force, Mr. Banks experienced conscious pain and suffering.

80.     None of the Defendant Officers **ever** had a reasonable fear of imminent bodily harm, nor did they have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Banks **at any point in time**.

81.     As a direct and proximate result of the acts and omissions described herein, Mr. Banks suffered compensatory and special damages as defined under federal common law and at an amount decided by a jury.

82.     Punitive damages are available against Defendants Whistler and Blanner and are hereby claimed as a matter of federal common law per *Smith v. Wade*, 461 U.S. 30 (1983) where Defendant Officers' conduct involved a reckless or callous indifference to Mr. Banks federally protected rights.

83.     Mr. Banks is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Count II—42 U.S.C. § 1983—*Monell* Liability
*Plaintiff v. City of Cape Girardeau*

84.     Mr. Banks hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

85.     The Cape Girardeau City Charter provides: "The city manager shall be the chief administrative officer of the city and shall be responsible to the council for the proper administration of all city affairs placed in his charge by or under this Charter. To that end, he shall have the following powers and duties: (a) He shall appoint and, when he deems it necessary for the good of the service, suspend or remove all city employees and appointive administrative officers provided for by or under this Charter, except as

14

otherwise provided by law, by this Charter or by personnel rules adopted pursuant to this Charter. He may authorize any administrative officer who is subject to his direction and supervision to exercise these powers with respect to subordinates in that officer's department, office or agency; (b) He shall direct and supervise the administration of all departments, offices and agencies of the city, except as otherwise provided by this Charter or by law; (c) He shall attend all council meetings and shall have the right to take part in discussion but may not vote. He shall receive notice of all special meetings; (d) He shall see that all laws, ordinances, provisions of this Charter and acts of the council are faithfully enforced; (e) He shall prepare and submit the annual budget and capital program to the council; (f) He shall submit to the council and make available to the public a complete report on the finances and administrative activities of the city as of the end of each fiscal year; (g) He shall make such other reports as the council may require concerning the operations of city departments, offices and agencies subject to his direction and supervision; (h) He shall keep the council fully advised as to the financial condition of the city and make such recommendations to the council concerning the future needs of the city as he may deem appropriate; (i) He shall facilitate the prompt, economical and efficient dispatch of city business, and, to that end, he may from time to time organize or reorganize the work of the departments responsible to the city manager, assign assistants, deputies and employees from any office or department of the city government under the city manager to perform work or service in connection with any other office or department thereof, or to work in more than one of said offices or departments; (j) He shall have the right to examine, or cause to be examined, without

15

notice, the official conduct of any officer, assistant, deputy, clerk or employee in any of the departments of the city government under the control of the city manager; and (k) He shall perform such other duties as are specified in this Charter, or as may be required by the council not inconsistent with this Charter." (City Charter reference-Part I, art. IV, sect. 4.03).

86.     The City Manager, the City Council, and/or the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of Cape Girardeau Police Department ("CGPD") officers performing policing functions on behalf of the City.

87.     The City Manager, the City Council, and/or the Police Chief established and/or approved of CGPD's written policies and training governing the conduct of CGPD officers performing policing functions.

88.     The written policies and training established and/or approved by The City Manager, the City Council, and/or the Police Chief constitute the official policy of the City and were the moving force behind and caused Plaintiff's injuries.

89.     The City, acting by and through its City Manager and/or other policymakers, had knowledge of CGPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

90.     The City, acting by and through its City Manager and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from CGPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

16

91.     On or prior to July 20, 2024, Cape Girardeau, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the appropriate use of the Taser X26 and restraint process.

92.     On or prior to July 20, 2024, Cape Girardeau, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by CGPD officers.

93.     On or prior to July 20, 2024, Cape Girardeau, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned and required officers to treat the members of the Black Community of Cape Girardeau differently, including but not limited to implementing the use of the Taser X26 at a higher rate against Black men who did not pose a threat to officers.

94.     On or prior to July 20, 2024, Cape Girardeau, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

95.     Cape Girardeau, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee Defendants Whistler, Blanner and Hulver

despite knowledge of their repeated unconstitutional, unlawful, or other improper conduct.

96.    Cape Girardeau had the power to terminate or appropriately discipline Defendant Officers for their misconduct prior to July 20, 2024, but failed to do so despite the City's knowledge of a pattern of complaints regarding excessive force.

97.    By refusing to terminate Defendant Officers, Cape Girardeau caused Defendants Whistler, Blanner and Hulvey to act with impunity and without fear of retribution.

98.    Cape Girardeau's failure to terminate or properly discipline Defendants Whistler, Blanner and Hulvey is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Defendant Officers to continue engaging in unlawful acts towards arrestees, including Mr. Banks.

99.    The unconstitutional policies, practices, and customs defined herein were the moving force behind Mr. Banks' injuries.

100.    Mr. Banks suffered great injury as a direct and proximate result of the acts and omissions by Cape Girardeau.

101.    As a direct and proximate result of the acts and omissions described herein, Mr. Banks suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

102.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL ISSUES OF FACT HEREIN**

**Prayer for Relief**

WHEREFORE, Plaintiff Tyler M. Banks prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment against Defendants Whistler, Blanner and Hulvey for compensatory, special, and punitive damages together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest; and

2.      As to Count II, a money judgment against Defendant City of Cape Girardeau for compensatory and special damages in an amount to be decided with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest; and

3.      For such other and further relief as this Court deems just and fair.

Dated: May 10, 2025

**DERRICK R. WILLIAMS**
**Attorney & Counselor at Law, LLC**

/s/ *Derrick R. Williams*

Derrick R. Williams, 53416MO
1200 North Kingshighway, Ste. 204
Cape Girardeau, MO 63701
Telephone:    573-803-2051
Facsimile:     314-754-9591
Email: attydrwilliams@hotmail.com

*ATTORNEY FOR PLAINTIFF*